Craig A. Brandt (SBN 133905)
LAW OFFICE OF CRAIG A. BRANDT
5354 James Avenue
Oakland, CA  94618
Telephone: (510) 601-1309
Email:  craigabrandt@att.net
Attorney for Plaintiff
EDEN ENVIRONMENTAL CITIZEN'S GROUP, LLC

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDEN ENVIRONMENTAL CITIZEN'S GROUP, LLC, a California limited liability company,<br><br>       Plaintiff,<br><br>  vs.<br><br>PRECAST CONCRETE TECHNOLOGY UNLIMITED, LLC, a California limited liability company; REZKALLAH "REZ" MOULLA, an individual and a manager or member and the Legally Responsible Person of PRECAST CONCRETE TECHNOLOGY UNLIMITED, LLC and DOES 1-10, inclusive,<br><br>       Defendants. | Case No.:<br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF, CIVIL PENALTIES AND REMEDIATION**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§1251 et seq.)** |

Plaintiff EDEN ENVIRONMENTAL CITIZEN'S GROUP, LLC ("EDEN") hereby brings this civil action pursuant to the Federal Water Pollution Control Act, also known as the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq.*

## INTRODUCTION

1.      This action is a citizen suit for injunctive relief, declaratory relief, civil penalties, and remediation against Defendants for current and ongoing violations of the National Pollutant Discharge Elimination System ("NPDES") permit requirements of the CWA.

2.      On or about January 5, 2020, EDEN provided a Notice of Defendants' violations of the CWA to the (1) Administrator of the United States Environmental Protection Agency ("EPA"), (2) EPA's Regional Administrator for Region Nine, (3) Executive Director of the State Water Resources Control Board ("State Board") and (4) to Defendants, including a copy delivered to the Facility Manager of Defendant PRECAST CONCRETE TECHNOLOGY UNLIMITED, LLC, by certified mail, at 1260 Furneaux Road, Olivehurst, California ("the Facility"), as required by the CWA. 33 U.S.C. § 1365(b)(1)(A).

3.      A copy of EDEN's Notice of Intent to Sue is attached hereto as Exhibit "A" and incorporated herein by reference. (Exhibit A, "60-Day Notice of Violations and Intent to File Suit Under the Federal Water Pollution Control Act ("Clean Water Act") dated January 5, 2020.)

4.      More than sixty days have passed since EDEN's Notice was properly and lawfully served on Defendants, the State Board, and the Regional and National EPA Administrators.  EDEN is informed and believes, and thereupon alleges, that neither the National EPA, nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint. This action's claim for civil penalties is not barred by any prior administrative penalty under section 309(g) of the CWA, 33 U.S.C. § 1319(g).

## JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT

5.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. section 1331 (federal question), and 33 U.S.C. section 1365(a) (CWA citizen suit jurisdiction). The relief requested is authorized pursuant to 28 U.S.C. sections 2201-2202 (declaratory relief), 33 U.S.C. sections 1319(b), 1365(a) (injunctive relief), and 33 U.S.C. sections 1319(d), 1365(a) (civil penalties).

6.      The Permit under which this case arises is a Federally required permit based upon California state substantive law.  (*Southern California Alliance of Publicly Owned Treatment Works v. U.S. Environmental Protection Agency* (9th Cir. 2017), 853 F.3d 1076; *Dept. of Finance v. Commission on State Mandates,* 1 Cal.5th 749 (2016))

7.      By its express language, a violation of the State permit constitutes a per se violation of the Federal Clean Water Act.  (California's Industrial General Permit Order 2014-0057 DWQ, NPDES Order No. CAS000001, Section XXI.A)

8.      Venue is proper because Defendants reside in and the events or omissions giving rise to EDEN's claims occurred in this District. 28 U.S.C. §1391(b)(1), (2). Venue is also proper because the Facility's CWA violations have occurred and are occurring within the District. 33 U.S.C. § 1365(c)(1).

## PARTIES

9.      Plaintiff EDEN ENVIRONMENTAL CITIZEN'S GROUP, LLC ("EDEN") is an environmental membership group organized under the laws of the State of California as a limited liability company on June 1, 2018.  EDEN previously existed as an unincorporated environmental citizen's association, with members who remain associated with EDEN as of the date of the filing of this Complaint.

10.     EDEN's organizational purpose is the protection, preservation and enhancement of California's waterways.   Its mission is implemented by enforcing the provisions of the Federal Clean Water Act and California's Industrial General Permit by seeking redress from environmental harms caused by Industrial Dischargers who pollute the Waters of the United States, through community education and citizen suit enforcement when necessary.

11.     EDEN's members donate their time and money resources to protect, enhance, and assist in the preservation and restoration of rivers, creeks, streams, wetlands, vernal pools, and their tributaries located in California.

12.     EDEN has members throughout California.  Some of EDEN's members reside and work near the Sacramento River (the "Receiving Waters" for Defendant PRECAST CONCRETE TECHNOLOGY UNLIMITED, LLC's Facility storm water run-off which discharge into the Feather River, a tributary of the Sacrament River which then discharges into the San Francisco Bay), and use those waters and their watersheds for surfing, kayaking, camping, cycling, recreation, sports, fishing, swimming, hiking, photography, nature walks and scientific study.  Their use and enjoyment of these natural resources have been and continue to be adversely impaired by Defendants' failure to comply with the procedural and substantive requirements of the California Industrial General Permit and Federal Clean Water Act.

13.     EDEN has standing as an association to bring this suit against Defendants, as at least one of EDEN's current members is experiencing ongoing and continuing harm particular to him or her as a specific result of Defendants' violations of the CWA, and the resulting adverse effects to the environment and the Receiving Waters downstream from the Facility, and has experienced such harm since at least the date that EDEN provided to Defendants a 60-day Notice of Intent to Sue.

14.     Specifically, the individual member(s) who are experiencing harm from Defendants' violations of the CWA are reluctant to utilize the Receiving Waters downstream from the Facility as specified in Paragraph 10, above, due to the pollution caused by Defendants' environmental violations that EDEN's members believe has entered into the Facility's Receiving Waters; and the aesthetic and recreational interests of these members has been adversely impacted.

15.     Defendants' ongoing violations of the General Permit and the CWA have and will continue to cause irreparable harm to EDEN and certain of its current members, for which they have no plain, speedy, or adequate remedy.  The relief requested will redress the ongoing injury in fact to EDEN and its members.  Litigation of the claims asserted and the relief requested in this Complaint will not require the participation in this lawsuit of individual members of EDEN.

16.     EDEN is informed and believes, and on such information and belief alleges, that Defendant PRECAST CONCRETE TECHNOLOGY UNLIMITED, LLC, located at 1260 Furneaux Road, in Olivehurst, California, was formed on or about February 14, 2008 as a limited liability company, and is identified in the Regional Water Board's records as the Industrial General Permit applicant and operator of the Facility.

17.     EDEN is informed and believes, and on such information and belief alleges that Defendant REZKALLAH ("REZ") MOULLA, is the manager or member of Defendant PRECAST CONCRETE TECHNOLOGY, LLC, and the Legally Responsible Person ("LRP") for the Facility according to the documents on file with the Regional Water Board and the California Secretary of State.

18.     Defendant PRECAST CONCRETE TECHNOLOGY, LLC and Defendant REZKALLAH ("REZ") MOULLA (hereafter collectively known as "Defendants") continued to

violate the General Permit and the CWA as evidenced by documents and records contained in

the public database of the California Environmental Protection Agency, State Water Resources

Control Board's Storm Water Multiple Application and Report Tracking System ("SMARTS").

## STATUTORY BACKGROUND

19.    Congress declared that the Federal Clean Water Act was designed to "restore and

maintain the chemical, physical, and biological integrity of the Nation's waters" through federal

and state cooperation to develop and implement "programs for preventing, reducing, or

eliminating the pollution of navigable waters and ground waters." 33 U.S.C. §§ 1251(a), 1252(a).

20.    Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any

pollutant into waters of the United States, unless such discharge is in compliance with various

enumerated sections of the Act. Among other things, Section 301(a) prohibits discharges not

authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402

of the Act, 33 U.S.C. § 1342.

21.    Section 402(p) of the Act establishes a framework for regulating municipal and

industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p). States with

approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm

water discharges through individual permits issued to dischargers or through the issuance of a

single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. §

1342(p).

22.    Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the

U.S. EPA has authorized California's State Board to issue NPDES permits including general

NPDES permits in California.

General Permit

23.     The State Board elected to issue a statewide general permit for industrial storm water discharges. The State Board originally issued the General Permit on November 19, 1991, and modified it on September 17, 1992.   The State Board reissued the General Permit on April 17, 1997, and again on April 1, 2014 (the "2015 Permit" or "General Permit"), pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p). The 1997 Permit was in effect between 1997 and June 30, 2015.  The 2015 Permit went into effect on July 1, 2015.  The 2015 Permit maintains or makes more stringent the same requirements as the 1997 Permit.

24.     In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit. 33 U.S.C. § 1311(a).

25.     The General Permit contains several prohibitions. Effluent Limitation V(A) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.  Discharge Prohibition III(C) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

26.     Receiving Water Limitation VI(B) of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment. Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

27.     In addition to absolute prohibitions, the General Permit contains a variety of substantive and procedural requirements that dischargers must meet.  Facilities discharging, or having the potential to discharge, storm water associated with industrial activity which have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent to Comply ("NOI").  Dischargers have been required to file NOIs since March 30, 1992.

28.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP"). The SWPPP must describe storm water control facilities and measures that comply with the BAT and BCT standards.  The objective of the SWPPP requirement is to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges and authorized non-stormwater discharges from the facility, and to implement best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water discharges and authorized non-storm water discharges. General Permit, § X(C). These BMPs must achieve compliance with the General Permit's effluent limitations and receiving water limitations, including the BAT and BCT technology mandates.

29.     To ensure compliance with the General Permit, the SWPPP must be evaluated and revised as necessary. General Permit, § X(B).

30.     Failure to develop or implement an adequate SWPPP, or to update or revise an existing SWPPP as required, is a violation of the General Permit. General Permit, Fact Sheet §I (1).

31.     Sections X(D) – X(I) of General Permit set forth the requirements for a SWPPP. Among other requirements, the SWPPP must include: a pollution prevention team; a site map; a

list of significant materials handled and stored at the site; a description of potential pollutant sources; an assessment of potential pollutant sources; and a description of a specific mandatory set of minimum BMPs to be implemented at the facility that will reduce or prevent pollutants in storm water discharges and authorized non-stormwater discharges.

32.     The General Permit further requires dischargers to implement and maintain, to the extent feasible, any one or more of the following advanced BMPs necessary to reduce or prevent discharges of pollutants in industrial storm water discharges: exposure minimization BMPs, storm water containment and discharge reduction BMPs, treatment control BMPs, and other advanced BMPs.  General Permit, § X(H)(2).  Failure to implement advanced BMPs as necessary to achieve compliance with either technology or water quality standards is a violation of the General Permit.

33.     The General Permit also requires that the SWPPP include BMP Descriptions and a BMP Summary Table.  General Permit, § X(H)(4), (5).

34.     The General Permit requires dischargers to develop and implement an adequate written Monitoring and Reporting Program. The primary objective of the Monitoring and Reporting Program is to detect and measure the concentrations of pollutants in a facility's discharge to ensure compliance with the General Permit's discharge prohibitions, effluent limitations, and receiving water limitations.

35.     As part of their monitoring program, Dischargers must identify all storm water discharge locations that produce a significant storm water discharge, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented.

36.     Section XI(B) of the General Permit requires that Dischargers collect and analyze storm water samples from two qualifying storm events ("QSEs") during the first half of each reporting year (July 1 to December 31) and two QSEs during the second half of each reporting year (January 1 to June 30), and that the samples be collected from all outfalls identified in the Facility SWPPP.

37.     A QSE is a precipitation event that produces a discharge for at least one drainage area and is preceded by 48 hours with no discharge from any drainage area.  General Permit §XI(B)(2)

38.     Once the storm water samples have been collected, the General Permit requires that the Discharger deliver the samples to a qualified laboratory for analysis within 48 hours of collection (General Permit, Attachment H) and upload into SMARTS the resulting laboratory reports within 30 days from receipt of the report.  General Permit § XI(B)(4)

39.     Facilities are also required to make monthly visual observations of storm water discharges. The visual observations must represent the quality and quantity of the facility's storm water discharges from the storm event.  General Permit, § XI(A)

40.     The General Permit requires operators to conduct an Annual Comprehensive Facility Compliance Evaluation ("Annual Evaluation") that evaluates the effectiveness of current BMPs and the need for additional BMPs based on visual observations and sampling and analysis results. General Permit, § XV.

41.     Under the General Permit, facilities must analyze storm water samples for pH, oil & grease and total suspended solids, as well as additional parameters indicated in the Permit by facility type and those parameters identified by the Discharger on a facility-specific basis that

serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment.  General Permit, Section XI(B)(6)(c).

42.    The US EPA has established Parameter Benchmark Values as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT. These benchmarks represent pollutant concentrations at which a storm water discharge could potentially impair, or contribute to impairing, water quality, or affect human health from ingestion of water or fish.

43.    The Numeric Action Levels ("NALs") in the General Permit are derived from these benchmarks. The Permit incorporates annual NALs, which are derived from the 2008 Multi Sector General Permit ("MSGP") benchmark values, and instantaneous maximum NALs, which are derived from a Water Board dataset.

44.    The following annual NALs have been established under the General Permit for pollution parameters applicable to the Facility: pH – 6.0 - 9.0 standard units ("S.U."); total suspended solids ("TSS") – 100 mg/L; oil & grease ("O&G") – 15 mg/L; iron – 1.0 mg/L, , zinc –-.26 mg/L, aluminum – .75 mg/L, and chemical oxygen demand – 120 mg/L. General Permit Table 2.

45.    An exceedance of an annual NAL occurs when the average of all samples obtained for an entire facility during a single reporting year is greater than a particular annual NAL. The reporting year runs from July 1 to June 30.  An instantaneous maximum NAL exceedance occurs when two or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value (for TSS and O&G) or are outside of the instantaneous maximum NAL range for pH.  General Permit §XII(A)

46.     When a discharger exceeds an applicable NAL, it is elevated to "Level 1 Status," which requires a revision of the SWPPP and additional BMPs. If a discharger exceeds an applicable NAL during Level 1 Status, it is then elevated to "Level 2 Status."  General Permit § XII(C)

47.     For Level 2 Status, a discharger is required to submit an Action Plan requiring a demonstration of either additional BMPs to prevent exceedances, a determination that the exceedance is solely due to non-industrial pollutant sources, or a determination that the exceedance is solely due to the presence of the pollutant in the natural background.  General Permit §XII(D)

48.     Section XVI(A) of the General Permit requires that all Dischargers must certify and submit via SMARTS an Annual Report no later than July 15th following each reporting year using the standardized format and checklists in SMARTS.

49.     Furthermore, Section XXI(L) of the General Permit provides that all documents submitted to SMARTS, including SWPPPs and Annual Reports, be certified by a legally responsible party ("LRP") or duly authorized representative ("DAR") of the Facility, with the following certification:

"I certify under penalty of law that this document and all Attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system or those persons directly responsible for gathering the information, to the best of my knowledge and belief, the information submitted is, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

50.     Section XXI(N) of the General Permit provides that any person who knowingly makes any false material statement, representation, or certification in any record or other document submitted or required to be maintained under the General Permit, including reports of

compliance or noncompliance shall upon conviction, be punished by a fine of not more than $10,000, or by imprisonment for not more than two years, or by both. *See also* Clean Water Act section 309(c)(4)

### Central Valley Region 5S Basin Plan

51.     The Regional Board has identified beneficial uses of the Central Valley Region's waters and established water quality standards for the Sacramento River and its tributaries and the Sacramento-San Joaquin Delta in "The Water Quality Control Plan (Basin Plan) for the California Regional Water Quality Control Board, Central Valley Region – *The Sacramento River Basin and The San Joaquin River Basin*," generally referred to as the Basin Plan, and the "Water Quality Control Plan for the San Francisco Bay/Sacramento-San Joaquin Delta Estuary."

52.     The beneficial uses of these waters include, among others, domestic and municipal supply, water contact recreation, non-contact water recreation, wildlife habitat, warm and cold freshwater habitat, and fish spawning. The non-contact water recreation use is defined as "uses of water for recreational activities involving proximity to water, but where there is generally no body contact with water, nor any likelihood of ingestion of water. These uses include, but are not limited to, picnicking, sunbathing, hiking, camping, boating. . . hunting, sightseeing, or aesthetic enjoyment in conjunction with the above activities."

53.     The Basin Plan includes a narrative toxicity standard which states that all waters shall be maintained free of toxic substances in concentrations that produce detrimental physiological responses in human, plant, animal, or aquatic life.

54.     The Basin Plan provides that water shall not contain floating material in amounts that cause nuisance or adversely affect beneficial uses.

55.    The Basin Plan provides that water shall be free of discoloration that causes nuisance or adversely affects beneficial uses.

56.    The Basin Plan provides that waters shall not contain suspended materials in concentrations that cause nuisance or adversely affect beneficial uses.

57.    The Basin Plan also prohibits the discharges of oil and grease, stating that waters shall not contain oils, greases, waxes, or other materials in concentrations that cause nuisance, result in a visible film or coating on the surface of the water or on objects in the water, or otherwise adversely affect beneficial uses.

58.    The Basin Plan provides that at a minimum, water designated for use as domestic or municipal supply ("MUN") shall not contain concentrations of chemical constituents in excess of the maximum contaminant levels ("MCLs") specified in the following provisions of Title 22 of the California Code of Regulations, which are incorporated by reference into this plan: Tables 64431-A (Inorganic Chemicals) and 64431-B (Fluoride) of Section 64431, Table 64444-A (Organic Chemicals) of Section 64444, and Tables 64449-A (Secondary Maximum Contaminant Levels-Consumer Acceptance Limits) and 64449-B (Secondary Maximum Contaminant Levels-Ranges) of Section 64449.

59.    Title 22 of the California Code of Regulations provides an MCL for aluminum of 1.0 mg/L, for Cadmium of .01 mg/L, and lead of .05 mg/L.

60.    The Basin Plan provides that the pH shall not be depressed below 6.5 nor raised above 8.5; that iron levels not exceed .30 mg/L; that zinc not exceed .10 mg/L; that copper not exceed .0056 mg/L, and that cadmium not exceed .00022 mg/L.

61.    The Basin Plan requires that waters shall be free of changes in turbidity that cause nuisance or adversely affect beneficial uses."

62.     Table III-1 of the Basin Plan provides a water quality objective ("WQO") for iron of 0.3 mg/L.

San Francisco Bay Regional 2 Basin Plan

63.     The Water Quality Control Board, San Francisco Bay Region has adopted the "San Francisco Bay Basin (Region 2) Water Quality Control Plan" ("Basin Plan"), as amended by Resolution No. R2-2010-0100, setting forth the Water Quality Standards ("WQS") and beneficial uses for San Francisco Bay and its tributaries.

64.     The Beneficial Uses for San Francisco Bay are industrial service supply, shellfish harvesting, fish migration, preservation of rare and endangered species, fish spawning, commercial and sportfishing, estuarine habitat, wildlife habitat, recreational activities involving contact with water, recreational activities involving proximity to water, and navigation. *See* Basin Plan, Table 2-1.

65.     Surface waters that cannot support the Beneficial Uses of those waters listed in the Basin Plans are designated as impaired water bodies pursuant to Section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d).

66.     Polluted discharges from industrial sites, such as the Facility, contribute to the degradation of these already impaired surface waters and aquatic-dependent wildlife. Discharges of pollutants at levels above WQS contribute to the impairment of the Beneficial Uses of the waters receiving the discharges.  WQS applicable to dischargers covered by the Storm Water Permit include, but are not limited to, those set out in the Basin Plan and in the Criteria for Priority Toxic Pollutants for the State of California ("CTR"), 40 C.F.R. § 131.38.

67.     The Basin Plan sets forth, among other things, narrative WQS for floating material, O&G, sediment, settleable matter, and suspended materials, and sets forth numeric

WQS for pH, arsenic, cadmium, chromium VI, copper, cyanide, lead, mercury, nickel, selenium, silver, tributyltin, zinc, and PAHs. *See* Basin Plan §§ 3.3.6, 3.3.7, 3.3.9, 3.3.12-3.3.14, 3.3.21, and Table 3-3.

68.     The Basin Plan also includes site specific objectives ("SSOs"), which are WQS for specific sites, for certain pollutants of concern, including copper and nickel. *See* Basin Plan, Table 3-3A.  The CTR includes numeric criteria set to protect human health and the environment in the State of California.

69.     Discharges with pollutant levels in excess of the CTR criteria, the Basin Plan standards, and/or other applicable WQS are violations of Receiving Water Limitations in Section VI(A) of the General Permit.

Citizen Suit Provision of the CWA

70.     Under the CWA, any citizen may commence a civil action against any person who is alleged to be in violation of an effluent standard or limitation under the CWA or an Order issued by a State with respect to such a standard or limitation." 33 U.S.C. §1365(a)(1). No action may be commenced prior to sixty days after the plaintiff has given notice of the alleged violation (i) to the Administrator of the EPA, (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator of the standard, limitation, or order." 33 U.S.C. § 1365(b)(1)(A).  By including a citizen suit provision in the CWA, Congress ensured that the purposes and requirements of the CWA would be enforced, either by the United States government or by concerned citizens.

71.     In furtherance of the water preservation goals established by the CWA, the citizen suit provision confirms the district court's jurisdiction to apply any appropriate civil penalties under section 1319(d).  33 U.S.C. § 1365(a). Section 1319(d) declares that any person who

violates any permit condition or limitation implementing any of such sections in an NPDES permit shall be subject to a civil penalty not to exceed $46,192 per day for each violation occurring before November 2, 2015, and $51,570.00 per day per violation for violations occurring after November 2, 2015.   33 U.S.C. § 1319(d); 40 C.F.R. § 19.4; General Permit XXI.Q.1.

72.    Violations of provisions of the General Permit, including those detailed below, constitute violations of the CWA and are subject to civil penalties. General Permit § XXI; 33 U.S.C. §§ 1319(d), 1342; 40 C.F.R. §§ 19.1-19.4.

## FACTUAL ALLEGATIONS WHICH GIVE RISE TO CLAIMS

73.    Defendant PRECAST CONCRETE TECHNOLOGY UNLIMITED, LLC is a manufacture of precast concrete walls panels, beams, double tees and columns for commercial construction projects. EDEN is informed and believes that the Facility falls under standard industrial classification ("SIC") code 3272.

74.    EDEN is informed and believes that PRECAST CONCRETE TECHNOLOGY UNLIMITED, LLC stores industrial materials outdoors that can be exposed to storm water, eroded by wind, and otherwise contaminate the surrounding watershed.

75.    Based on EDEN's investigation, including a review of the Facility's Notice of Intent to Comply with the Terms of the Industrial General Permit, SWPPP, aerial photography, and EDEN's information and belief, storm water is collected and discharged from the Facility through a series of channels that discharge via at least one outfall.  The outfall discharges storm water and pollutants contained in that storm water directly into the Feather River, a tributary of the Sacramento River, a navigable Water of the United States, which then discharges into the San Francisco Bay.

76.     Plaintiff is informed and believes, and thereupon alleges that the storm water flows over the surface of the Facility where industrial activities occur and areas where airborne materials associated with the industrial processes at the facility may settle onto the ground. Plaintiff is informed and believes, and thereupon alleges that storm water flowing over these areas collects suspended sediment, dirt, metals, and other pollutants as it flows towards the storm water channels.

77.     On information and belief, Plaintiff alleges that there are insufficient structural storm water control measures installed at the Facility.  Plaintiff is informed and believes, and thereupon alleges, that the management practices at the Facility are currently inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States.

Deficient/ Non-Existent SWPPP/Failure to Follow or Update SWPPP

78.     On information and belief, Plaintiff alleges that since at least on or about June 10, 2015, Defendants have failed to implement an adequate SWPPP for the Facility.

79.     Plaintiff is informed and believes, and thereupon alleges, that the Facility's SWPPP does not set forth site-specific Best Management Practices (BMPs) for the Facility that are consistent with BAT or BCT for the Facility.

80.     Plaintiff is informed and believes, and thereupon alleges, that the SWPPP prepared for the Facility does not comply with the requirements of Sections X(G)(1)(e), X(G)(2), and X(H) of the General Permit.

81.     According to information available to EDEN, Defendant's SWPPP has not been evaluated to ensure its effectiveness and revised where necessary to further reduce pollutant

discharges. Plaintiff is informed and believes, and thereupon alleges, that the SWPPP does not include each of the mandatory elements required by the General Permit. (Section X(A).)

82.   Plaintiff is informed and believes, and thereupon alleges, that Defendants have failed and continues to fail to revise the Facility's SWPPP and site-specific BMPs consistent with the General Permit, in violation of Section X(B)(1) of the General Permit.

83.   Furthermore, Plaintiff is informed and believes, and thereon alleges, that Defendants have failed to upload an amended SWPPP to incorporate additional BMPs recommended by its SWPPP in the Facility's Level 1 ERA Report dated September 16, 2018, in violation of Section XII(C)(2) of the General Permit.

84.   Plaintiff is informed and believes, and thereon alleges, that Defendants have failed to incorporate the significant revisions contained in the Level 2 ERA Action Plan dated January 2018, into the SWPPP, in violation of Section X(B)(3) of the General Permit.

85.   Plaintiff is informed and believes, and thereon alleges, that Defendants have failed to, within 30 days, incorporate the significant revisions contained in the Level 2 ERA Action Plan dated January 2018, into the SWPPP, in violation of Section X(B)(3) of the General Permit.

86.   Plaintiff is informed and believes, and thereon alleges, that the date of each amendment or significant revision to the SWPPP was not included within the current SWPPP, in violation of Section X(A)(10).

87.   Plaintiff is informed and believes, and thereon alleges, that Regional Water Board inspected the Facility on June 10, 2015 and noted the Facility's SWPPP did not designate discharge multiple locations as sampling locations, a violation of Section X(A)(2) of the General Permit.

88.     Furthermore, the Regional Water Board inspected the Facility on March 1, 2018, and noted that the Facility's housekeeping and other control non-structure BMP practices at the Facility had not significantly improved since the previous inspections, a violation of Section X(A)(6) of the General Permit.

89.     In addition, Plaintiff alleges that Defendants have failed to comply with the provisions of its current SWPPP in the areas of monitoring and reporting.

90.     Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events into the ("Receiving Waters") of the Feather River, a tributary of the Sacrament River which then discharges into the San Francisco Bay, including the pollutants of pH, Total Suspended Solids (TTS), Oil & Grease (O&G) [Sections XI(B)(6)(a) and XI(B)(6)(b)]; and Iron [Section XI(B)(6)(d)].

91.     Plaintiff is informed and believes, and thereon alleges, that Defendants failed, on numerous occasions, to utilize the correct sampling parameter units in its analytical reports by using units of micrograms per liter ("ug/L"), instead of milligrams per liter ("mg/L"), in violation of Table 2, Section XI(B)(11) of the General Permit.

92.     Plaintiff is informed and believes, and thereon alleges, that Defendants failed to upload several storm water sample analyses within 30 days, a violation of Section XI(B)(11)(a) of the General Permit.

93.     Information available to Plaintiff indicates that Defendant has not fulfilled the requirements set forth in the General Permit for discharges from the Facility due to the continued discharge of contaminated storm water.  Plaintiff is informed and believes, and thereupon alleges, that all the violations alleged in this Complaint are ongoing and continuing.

Monitoring and Reporting

94.     On information and belief, EDEN alleges that Defendants have an inadequate monitoring program at its Facility.

95.     On information and belief, EDEN alleges that during the time period of January 1, 2016 through June 30, 2016, Defendants failed to collect and analyze one of two required storm water samples for that reporting period, in violation of Section X(B)(2) of the General Permit.

96.     On information and belief, EDEN alleges that during the time period of July 1, 2018 through December 31, 2019, Defendants failed to collect and analyze one of two required storm water samples for that reporting period, in violation of Section X(B)(2) of the General Permit.

97.     On information and belief, EDEN alleges that Defendants have failed to conduct monthly visual observations of storm water discharges at the Facility since at least July 1, 2015.

98.     On information and belief, EDEN alleges that Defendants have failed to collect storm water samples from each drainage area at all discharge locations for each Qualified Storm Event ("QSE") where sampling is performed, pursuant to General Permit Section XI(B)(4). Pursuant to Defendants' SWPPP for its Facility, it has three (3) discharge and sampling locations.  None of the samples it collected between November 2, 2015 through February 4, 2019 contained sampling for all discharge/sampling locations.  Furthermore, according to a Regional Water Board inspection report dated November 18, 2015, none of the multiple discharge locations on the East side of the Facility were being sampled and were not identified on the SWPPP, in violation of Section XI(B)(4).

99.     EDEN is informed and believes that Defendants have failed to analyze the Facility's storm water samples for the required parameters, in violation of Section XI(B)(6) of

the General Permit. Specifically, Section XI(B)(6)(d) of the General Permit requires additional sampling parameters of Iron, which are required based on the Facility's SIC code of 3272 (manufacturing of concrete products).

100.    EDEN is informed and believes that Defendants have failed to upload Facility storm water sample analyses within 30 days of obtaining the result for the sampling event, in violation of Section XI(B)(11) of the General Permit. Specifically, Defendants failed to upload into SMARTS within 30 days the following sample analyses:

- Lab report for 12-15-15 uploaded 7 months late.

- Lab report for 1-27-16 uploaded 6 months late.

- Lab report for 10-24-16 uploaded 7 months late.

- Lab report for 12-15-16 uploaded 5 months late.

- Lab report for 1-17-17 uploaded 5 months late.

Falsification of Annual Reports

101.    EDEN is informed and believes that Defendants have submitted falsified Annual Reports to the Regional Water Quality Control Board in violation of Sections XXI(L) and XXI(N) of the General Permit.

102.    Specifically, on July 18, 2016, July 3, 2018 and July 15, 2019 Defendants submitted its Annual Reports for the Fiscal Years 2015-16, 2017-18 and 2018-19, respectively. These Annual Reports were signed under penalty of law by Defendant REZKALLAH ("REZ") MOULLA who is the currently designated Legally Responsible Person ("LRP") for the for the Facility.

103.    Defendant REZKALLAH ("REZ") MOULLA responded "Yes" to Question No. 3 on the Annual Reports he submitted. ("Did you sample the required number of Qualifying

Storm Events during the reporting year for all discharge locations, in accordance with Section XI.B") However, Defendant REZKALLAH ("REZ") MOULLA actually failed to collect and analyze the required number of storm water samples during the following reporting periods:

- Reporting year 2015-16 – missing one (1) storm water sample for second half of reporting year;

- Reporting year 2017-18 – missing two (2) storm water samples for first half of reporting year;

- Reporting year 2018-19 – missing one (1) storm water sample for first half of reporting year, and

- Reporting year 2018-19 – missing two (2) storm water samples for the first half of reporting year and one (1) storm water sample for the second half of the reporting year.

103.    Records from the National Oceanic and Atmospheric Administration (NOAA) website/database confirm that during the reporting years 2015-16, 2017-18 and 2018-19, there were sufficient Qualified Storm Events (QSEs) occurring near the Facility during or within 12 hours of the start of regular business hours to allow Defendants to collect the requisite number of samples.

104.    If a Facility does not collect four storm water samples during a particular reporting year, the reporting requirements of the General Permit require the Discharger to indicate "NO" to Question NO. 3 on the Facility Annual Report and to provide an explanation for why the required number of samples were not collected. Here, Defendants did not answer "No" to Question No. 3 on any of the Facility's Annual Reports, and thus, failed to explain why they did not collect the required number of storm water samples.

105.    Based on the foregoing, it is clear that Defendants intentionally made false statements in the Facility's 2015-16, 2017-18 and 2018-19 Annual Reports when Defendants indicated that the Facility had collected the required number of storm water samples according to

Section XI.B of the General Permit. Furthermore, Defendants failed to collect storm water samples from all discharge locations designated on the Facility's Site Map pursuant to Section X.I.B of the General Permit.

<u>Failure to Implement BAT/BCT and BMPs</u>

106.    EDEN is informed and believes that Defendants have failed to identify and implement Best Management Practices ("BMPs") at its Facility that comply with the requirements of the General Permit for best conventional treatment (BCT) for conventional pollutants, and best available technology (BAT) for toxic and non-conventional pollutants. These technology-based pollution controls are required to be implemented in a manner that reflects best industry practice considering technological availability and economic practicability and achievability.  General Permit Sections I(C), V(A).

107.    For example, the Regional Water Board issued a Notice of Violation for the Facility on March 26, 2018 and noted the Facility was failing to implement proper BMPs to meet BAT/BCT standards of the General Permit. The Facility was instructed to implement BMPs to reduce TSS and iron discharges, contain all processed water, and install a sample port to allow the Discharger to collect representative storm water samples without removing sediment control BMPs.

108.    In addition, the Regional Water Board inspected the Facility on February 26, 2019 and noted the Discharger had not made satisfactory progress at implementing effective BMPs and had not improved since 2012.

109.    Furthermore, the Regional Water Board issued another Notice of Violation on March 19, 2019, on the Facility for failing to reduce TSS, iron and pH discharges and for failing to ensure BMPs were in fact removing onsite pollutants before being discharged.

110.    Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events from the Facility into the Feather River, a tributary of the Sacrament River which then discharges into the San Francisco Bay.

Discharges of Contaminated Storm Water

111.    Due to the nature of the operations at the Facility, coupled with the documented lack of proper BMP implementation and unauthorized non-storm water discharges, Defendants are discharging storm water containing excessive levels of pollutants specific to their operation during every significant local rain event since 2015 through 2019.  These pollutants include pH, oil & grease (O&G), total suspended solids (TSS) and Iron.

112.    Since 2015 Defendants have taken samples or arranged for samples to be taken of storm water discharges at the Facility.

113.    The Facility has reported numerous discharges in excess of narrative and numeric water quality standards established in the Basin Plan. These discharges have violated Discharge Prohibitions III(C) and III(D) and Receiving Water Limitations VI(A) and VI(B) of the General Permit and are evidence of ongoing violations of Effluent Limitation V(A) of the Permit.

114.    Specifically, the levels of TSS in storm water detected by the Facility have exceeded the benchmark value and annual NAL for TSS of 100 mg/L established by EPA and the State Board, respectively, and the instantaneous NAL value for TSS of 400 mg/L established by the State Board.

115.    For example, for the reporting year 2015-16 the TSS level at the facility was measured at 630 mg/L. That level is 6.3 times the benchmark value and annual NAL for TSS.

Defendants also has measured levels of TSS in excess of 100 mg/L in storm water discharged from the Facility for the reporting years 2015-16, 2016-17, 2017-18, 2018-19.

116.    The levels of Iron in storm water detected by the Facility have exceeded the Water Quality Objective ("WQO") established by the Basin Plan of 0.3 mg/L for iron of 0.3 mg/L. For example, for the 2018-19 reporting year, the Iron level at the facility was measured at 19.3 mg/L. That level is 64.33 times the WQO for Iron. Defendant also has measured levels of Iron in excess of 0.3 mg/L in storm water discharged from the facility for the reporting years 2015-16, 2016-17, 2017-18, 2018-19.

Failure to Comply with Required Exceedance Response Actions

117.    On July 1, 2017 the Defendants were elevated to Level 2 status for exceedances of TSS and Iron.

118.    Pursuant to Section XII(D)(1) of the General Permit, Defendants' Level 2 ERA Action Plan was due to be prepared and uploaded into SMARTS by January 1, 2018. The Defendants submitted its required Level 2 ERA Action Plan on February 22, 2018, and thus, Defendants failed to comply with Section XII(D)(1) of the General Permit.

119.    Pursuant to Section XII(D)(2) of the General Permit, Defendants' Level 2 ERA Technical Report was due to be prepared and uploaded into SMARTS by January 1, 2019. Defendants submitted its required Level 2 ERA Technical Report on February 27, 2019, and thus Defendants failed to comply with Section XII(D)(2) of the General Permit.

Failure to Comply with a Mandate of the Regional Water Board

120.    On August 28, 2015, March 26, 2018 and March 19, 2019, the Regional Water Board issued Notices of Violation to Defendants for failing to upload on to SMARTS an

adequate SWPPP and Site Map that fully complied with the General Permit and for failing to implement proper BMPs.

121.  On March 19, 2019, the Regional Water Board issued a Notice of Violation to the Facility for a deficient Level 2 ERA Technical Report, stating that it does not evaluate the effectiveness of the BMPs installed in accordance with the Level 2 ERA Action Plan, and it does not clearly identify what additional BMPs the Facility plans to implement to address ongoing NAL exceedances in accordance with Section XIX of the General Permit.

122.    To date, Defendants have failed to comply with all the mandates of the Regional Water Board.

Failure to Train Employees

123.    The General Permit require all Facilities to designate a Legally Responsible Person to implement the requirements of the Permit, who is then responsible for appointing a Pollution Prevention Team and ensuring that the Team is properly trained in at least the following minimum requirements: BMP implementation, BMP effectiveness evaluations, visual observations, and monitoring activities.

124.    Defendants have failed to implement adequate BMPs at the Facility, have not conducted monthly visual observations, and have failed to comply with required storm water sampling and analysis.

125.    Further evidence of the Facility's failure to train its employees is demonstrated by the numerous Notion of Violations issued by the Regional Water Board since 2015.

**FIRST CAUSE OF ACTION**
**Failure to Prepare, Implement, Review, and Update**
**an Adequate Storm Water Pollution Prevention Plan**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

126.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

127.    The General Permit requires dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP.

128.    As outlined herein, Defendants have failed to develop and implement an adequate SWPPP for the Facility.

129.    Each day since June 10, 2015, that Defendants failed to develop, implement and update an adequate SWPPP for the Facility is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a) against all Defendants.

**SECOND CAUSE OF ACTION**
**Failure to Develop and Implement an**
**Adequate Monitoring and Reporting Program**
**(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

130.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

131.    The General Permit requires dischargers of storm water associated with industrial activity to have developed and be implementing a monitoring and reporting program (including sampling and analysis of discharges) that complies with the terms of the General Permit.

132.    As outlined herein, Defendants have failed to develop and implement an adequate monitoring and reporting program for its Facility.

133.    Defendants ongoing failure to develop and implement an adequate monitoring and reporting program are evidenced by its failure to collect the required number of storm water samples pursuant to the requirements of the General Permit.

134.    Each day since at least June 10, 2015, that Defendants have failed to develop and implement an adequate monitoring and reporting program for its Facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a) against all Defendants. The absence of requisite monitoring and analytical results are ongoing and continuous violations of the Act.

135.    Noncompliance with the General Permit constitutes a violation of the CWA against all Defendants. General Permit Section XXI(A); 33 U.S.C. § 1342.

### THIRD CAUSE OF ACTION
### Submission of False Annual Reports to the Regional Water Board
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

136.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

137.    Section XVI of the General Permit requires that Annual Reports submitted to SMARTS be certified under penalty of law, pursuant to Section XXI(L) which provides significant penalties for submitting false information.

138.    Specifically, Clean Water Action section 309(c)(4) and Section XXI(N) of the General Permit provide a maximum penalty to any person who knowingly makes a false material statement, representation or certification in any record or other documents submitted or required to be maintained under the General Permit, including Annual Reports, up to and including a fine of $10,000 and imprisonment of two years, or both.

139.    As delineated herein, Defendant PRECAST CONCRETE TECHNOLOGY, LLC and Defendant REZKALLAH ("REZ") MOULLA, the designated LRP for the Facility made false representations in the Facility's Annual Report(s) for the Fiscal Years 2015-16, 2016-17 and 2018-19, respectively, as noted in the Annual Reports dated July 18, 2016, July 3, 2018 and July 15, 2019, that the Facility had sampled the required number of QSEs during the reporting year for all discharge locations, in accordance with Section XI(B) of the General Permit.

140.    As delineated herein, Defendant PRECAST CONCRETE TECHNOLOGY, LLC and Defendant REZKALLAH ("REZ") MOULLA, the designated LRP for the Facility, made false representations in the Facility's Annual Report(s) that the Facility was unable to sample the required number of QSEs during the reporting year for all discharge locations because there were insufficient QSEs in the vicinity of the Facility during operating hours.

141.    In fact, there were sufficient QSEs throughout the reporting year during operating hours, according to NOAA records, such that the Facility could have easily collected the required number of samples. Further, other nearby Facilities were able to collect storm water samples during the time periods Defendants claim there were insufficient QSEs.

142.    At the time that Defendant REZKALLAH ("REZ") MOULLA made the false representations referred to above, he knew or should have known that the representations were false but proceeded nonetheless to certify under penalty of law to the Regional Water Board that the information contained in the Annual Reports was true and correct.

143.    Each time Defendant REZKALLAH ("REZ") MOULLA submitted false statements to the Regional Water Board under penalty of perjury is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a) against all Defendants.

### FOURTH CAUSE OF ACTION
### Failure to Implement the Best Available and
### Best Conventional Treatment Technologies
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

144.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

145.    The General Permit's SWPPP requirements and Effluent Limitation V(A) of the General Permit require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.

146.    Defendants failed to implement BAT and BCT at the Facility for its discharges of TSS and Iron, and other potentially un-monitored pollutants, in violation of Effluent Limitation V(A) of the General Permit.

147.    Each day since at least June 10, 2015, that Defendants have failed to develop and implement BAT and BCT in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a) against all Defendants.

### FIFTH CAUSE OF ACTION
### Discharges of Contaminated Storm Water
### in Violation of Permit Conditions and the Act
### (Violations of 33 U.S.C. §§ 1311, 1342)

148.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

149.    Discharge Prohibition III(C) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water VI(B) of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the

environment. Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

150.    Plaintiff is informed and believes, and thereupon alleges, that since at least June 10, 2015 Defendants have been discharging polluted storm water from the Facility, in excess of applicable water quality standards in violation of Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the General Permit.

151.    During every rain event, storm water flows freely over exposed materials, waste products, and other accumulated pollutants at the Facility, becoming contaminated with Iron, and other potentially un-monitored pollutants at levels above applicable water quality standards. The storm water then flows untreated into the Feather River, a tributary of the Sacrament River which then discharges into the San Francisco.

152.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing or contributing to the violation of the applicable water quality standards in a Statewide Water Quality Control Plan and/or the applicable Regional Board's Basin Plan in violation of Receiving Water Limitations of the General Permit.

153.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitations of the General Permit.

154.    Every day since at least June 10, 2015, that Defendants have discharged and continues to discharge polluted storm water from its Facility in violation of the General Permit is

a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a) against all

Defendants.  These violations are ongoing and continuous.

### SIXTH CAUSE OF ACTION
**Failure to Comply with Required Exceedance Response Actions**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

155.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set

forth herein.

156.    The General Permit requires that all Dischargers who enter Level 1 or Level 2

status comply with specific Exceedance Response Actions delineated in Section XII of the

General Permit.

157.    On July 1, 2017, PRECAST CONCRETE TECHNOLOGY, LLC entered Level 2

status.

158.    As herein alleged, Defendants have failed to date to comply with all the

Exceedance Response Actions required of it by the General Permit.

159.    Each day since July 1, 2017, that Defendants have failed to comply with all the

Exceedance Response Actions required by the General Permit is a separate and distinct violation

of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a) against all Defendants.

### SEVENTH CAUSE OF ACTION
**Failure to Comply with the Mandates of the Regional Water Board**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

160.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set

forth herein.

161.    Regional Water Boards have general authority to enforce the provisions and

requirements of the General Permit, including reviewing SWPPPs, Monitoring Implementation

Plans, ERA Reports, and Annual Reports and requiring Dischargers to revise and re-submit

Permit Registration Documents ("PRDs"), conducting compliance inspections, and taking enforcement actions.   General Permit Section XIX

162.    On August 28, 2015, March 26, 2018 and March 19, 2019, the Central Valley Regional Water Quality Control Board 5S issued Defendants multiple Notices of Violation requiring that Defendants upload into SMARTS an adequate SWPPP and Site Map that fully complied with the General Permit, implement proper BMPs.

163.    To date, Defendants have failed to comply with all those mandates.

164.    Each day since June 10, 2015, that Defendants have failed to comply with the mandates of the Regional Water Board is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a) against all Defendants.

**EIGHTH CAUSE OF ACTION**
**Failure to Properly Train Facility Employees and Pollution Prevention Team**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

165.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

166.    Section X.D.1 of the General Permit requires each Facility to establish a Pollution Prevention Team who is then responsible for assisting with the implementation of the requirements of the General Permit. The Facility is also required to identify alternate team members to implement the SWPPP and conduct required monitoring when the regularly assigned Pollution Prevention Team members are temporarily unavailable (due to vacation, illness, out of town business, or other absences).

167.    Section X.H.f of the General Permit also requires that each facility ensure that all of its Pollution Prevention Team members implementing the various compliance activities of the General Permit are properly trained in at least the following minimum requirements: BMP

implementation, BMP effectiveness evaluations, visual observations, and monitoring activities. Further, if a Facility enters Level 1 status, appropriate team members must be trained by a Qualified Storm Water Practitioner ("QISP").

168.    Since at least June 10, 2015, Defendants have failed to properly train Facility employees and the designated members of its Pollution Prevention Team, which has resulted in the General Permit violations alleged herein.

## NINTH CAUSE OF ACTION
### (Recovery Under the Catalyst Theory CCP §1021.5)

169.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

170.    Under the substantive law of California, if a plaintiff is a catalyst in encouraging a Defendant to voluntarily comply with its legal obligations, the plaintiff may recover its fees and costs. *Graham v. DaimlerChrysler Corp.*, 101 P.3d 140, 21 Cal. Rptr. 3d 331, 34 Cal. 4th 553 (2004), *Tipton-Wittingham v. City of Los Angeles* (Cal. Dec. 2, 2004), 34 Cal.4th 604, 21 Cal.Rptr.3d 371, 101 P.3d. 174, 2004 Cal. LEXIS 11335.

171.    A requirement for recovery under the catalyst theory is that a plaintiff first advise the Defendant of the claim and provide an opportunity to resolve the matter.  The Plaintiff in this case complied by providing both the catalyst and the written notice of the claim to Defendants prior to suit. (Exhibit A, attached hereto and incorporated by reference "60-Day Notice of Violations and Intent to File Suit Under the Federal Water Pollution Control Act ("Clean Water Act") dated January 5, 2020.)

172.    In the event Defendants allege the claims are moot or are non-justiciable, then Plaintiff must be awarded its fees and costs under California Code of Civil Procedure Section 1021.5 ("Catalyst Theory").

173.    Since the substantive law of California governs awards of Catalyst Theory fees (as opposed to Federal law), Plaintiff requests the Court exercise supplemental jurisdiction over any award of Catalyst Theory fees.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment providing the following relief:

1.    Declare Defendants to have violated and to be in violation of the CWA;

2.    Issue an injunction ordering Defendants to immediately operate the Facility in compliance with the NPDES permitting requirements contained in the General Permit and the CWA;

3.    Enjoin Defendants from discharging pollutants from Defendant PRECAST CONCRETE TECHNOLOGY, LLC's Facility to the surface waters surrounding the Facility until such time as PRECAST CONCRETE TECHNOLOGY, LLC has developed and implemented an adequate SWPPP, Site Map and implemented appropriate BMPs;

4.    Order Defendants to pay civil penalties of $51,570 per day/per violation for each violation of the Act pursuant to 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1, 19.2-19.4;

5.    Order Defendants to take appropriate actions to restore the quality of United States waters impaired by its activities at PRECAST CONCRETE TECHNOLOGY, LLC Facility;

6.    Order Defendants to pay EDEN's reasonable attorneys' fees and costs (including expert witness fees), as provided by 33 U.S.C. § 1365(d) and applicable California law;

7.    Award Plaintiff additional attorney fees under California Code of Civil Procedure §1021.5, to the extent that Plaintiff's Notice of Intent to Sue directed to Defendants was the

catalyst for Defendants' voluntary corrective action or cessation of the violations included in Plaintiff's Notice, provided that Defendants undertook any such corrective action after receiving Plaintiff's Notice, and;

8.      Award such other and further relief as may be just and proper.


Dated: October 26, 2020                    Respectfully,


                                           By:  /s/ Craig A. Brandt
                                                Craig A. Brandt
                                                Attorney for Plaintiff